Mr. J ustice Cox
delivered the opinion of the court.
These cases, although relating to different pieces of property, involve the same questions.
The complainants claim respectively to be the owners of *286 the entire square 472, in Washington, and of lot No. 1 3 On square 504, both of which pieces of ground are bounded on the southwest bj^ Water street, which intervenes between them ."and .the Potomac river. They claim as an easement incident to this ownership, the exclusive l’ight of constructing 'and-using" wharves, in the ¡river on'the shore opposite' this groundj notwithstanding the intervention of Water street between it and the river, and seek injunctions to prevent the defendants ’from encroaching upon this alleged exclusive privilege by constructing wharves, on their Own account, at the* localities in question!
The defendants claim' that the fee-simple title to Water street is vested in the United States, and that whatever riparian right, such as that of wharfing into the river, attach to the ownership of the land bordering on the river, belong to the United States, and that the defendants are acting under its authority in erecting the structures complained of.
At the date of the cession of the District of Columbia to the United States, by the States of Maryland and Virginia, Notley Young was the owner of a tract of land called Duddington Pastures, embracing about four hundred acres, bordering on the Potomac river, between what is now Fourteenth street on the west, and the United States Arsenal on the east, in the city of Washington, which tract included what are now squares 472 and 504 in said city.
At common -law, the land upon tide waters, between high find low water mark, was called the shore, and was vested in the Crown. The title of the private owner on the sea or tide water .rivers extended only to high water mark, and, as a consequence, he had no right to construct wharves extending over the shore into the water.
In this country, the title to the shore would vest in the Slate. But the tendency of legislation has been in favor of an appropriation of the shore for private uses.
In accordance with this policy, in a compact made between the' States Of Máiyland and Virginia, concluded by the commissioners of the two States- in "March- 1775, ánd'afténváfdk ratified -by ‘the ' State 'of Maryland by-act'oifi March'112," 1785, *287 it was stipulated that “ the citizens of each 'State respectively all have full property in .the shores of the ' Potomac river adjoining their lands, with all emoluments and.advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so-as not .to obstruct or injure the navigation of the river.”
It may be observed, in passing, though it may not be material to the determination of this cause, that it is at least a doubtful question whether this compact confers rights upon the riparian proprietor which are not defeasible by legislation. For-in the case of City of Georgetown vs. The Alexandria Canal Co., 12 Pet., 91, the Supreme Court held that this was a compact between the States alone, to which the citizens'of the States were not parties ; that-the.isame powers which'established it might annul it ; that Virginia and Maryland, while they retained the territory on the right and. left .banks of the Potomac, might modify this compact at their pleasure ; that when they ceded to Congress the portions of territory composing the District of Columbia, and embracing both sides of the Potomac-within its limits, whatever the legislatures of Maryland and Virginia could have done by their joint will, could, after that cession, bo done by Congress, subject only to the limitations imposed by the act of cession.
The act of cession gives to the United States “ exclusive jurisdiction as well of soil as of persons,” &c.; with the limitation, that nothing contained in it shall be so construed as to vest in the United States any right of property in the soil,” &c,, &c, But this limitation would be held to apply t-o titles derived from grant, and not to protect such individual rights as depended on the pleasure of the two States. If they had the right to repeal their compact, their transfer of f* full and absolute right and. .exclusive jurisdiction ”, to the United States would probably be held to confer the ■ same power upon the United States, as'to the property on- the shore, which resided in the two States,
But, however this may be, as long as the compact -.between-Maryland and Virginia continued unres.qin.ded, Notjey Young *288 was entitled, by virtue of it, to the privilege of wharfingfrom his land into the river. It is to be observed, that thi& privilege is confined by the compact in question to persons-whose lands the shore adjoins ; or, in other words, it is made an incident of riparian property. There is no reason for-doubting that, by contract or special enactment, the easement might be annexed to other than riparian property, but by force of this compact, which is the only law on the subject, it is only annexed to the latter. Consequently,' the-intervention of any other freehold ownership between a given tract of land and the river would be fatal to any claim of a wharfing privilege as a legal incident or appurtenance* to that tract.
In this condition of the law and of the facts, the District of Columbia was ceded to the United States, the boundaries-of the Federal city were established, and Notley Young and Other proprietors of the land within its limits conveyed all their land to Thomas Beall and John M. Gantt, upon the following trusts, viz.: 1. That the land be laid out with such streets, squares, parcels and lots as the President of the United States for the time being should approve ; 2. That Beall and Gantt should convey to the commissioners of the* Federal city, and their successors, for the use of the United States forever, all the said streets, and such of said squares,, parcels and lots as the President shall deem proper for the use of the United States; 3. That as to the residue of the lots, a fair and equal division of them should be made, and the lots assigned to the grantor should be conveyed to him, his heirs and assigns, by said Beall and Gantt, and the other lots should be sold and conveyed under direction of the President of the United States.
The land conveyed was divided into streets, squares and1 lots, and, in the plan of the city - which was ultimately adopted and approved by the President, a street called Water street was laid out on Notley Young’s land along the river shore, and squares 472 and 504 were laid out as bounded by said street; that is to say, the street intervened between the squares and the river.
*289 In December, 1798, the commissioners contracted to sell to Morris A. Greenleaf six thousand lots, among which it was agreed that they were to have the part of the city in Notley Young’s land. This agreement will be again adverted to hereafter.
In October, 1794, a division of lots between the commissioners, acting for the United States, and Notley Young, was entered of record, according to which, square 472 was allotted to Young, and square 504 to the United States. On the same day, the commissioners conveyed square 504 to James Greenleaf. together with all the other squares and lots assigned to the United States, in the land of Notley Young.
The titles of the complainants are derived through mesne conveyances from Notley Young as to square 472, and James Greenleaf as to square 504. Subsequently, at the request of the President, the trustees, Beall and Gantt, in pursuance of the deeds of trust, conveyed the streets and reservations to the commissioners to the use of the United States forever. The effect of these transactions was the same as if, without the intervention of trustees, Notley Young had conveyed square 504 and Water street immediately to the commissioners, for the use of the United States.
The first inquiry which suggests itself is, what was conveyed under the denomination of the street; was it the mere easement or privilege of using the street or public highway, or was it the land itself, the soil and freehold within the boundary of the streets? The United States Supreme Court have answered this question for us, in the case of Van Ness vs. The City of Washington and the United States, 4 Pet., 232. They say : “ The streets and public squares are declared to be conveyed for the use of the United States forever. These are the very words which by law are required to vest an absolute unconditional fee-simple in the United States. They are the appropriate terms of art, if we may so say, to express' an unlimited use in the Government. There are no other words or references in the instrument which control in any manner the natural meaning of them.” And, accordingly, the court held, that where the Govern *290 menfc had directed certain public reservations and a part of a street to be divided into lots and sold, the original proprietors had no claim upon the proceeds, but they were subject entirely to the disposition of the United States as the absolute owner of the land.
We are therefore to assume that the fee-simple of the land included in Water street was vested in the United States, and not a mere easement. Now, if Notley Young had conveyed the strip of land which forms Water street to a private citizen, in fee-simple, it would not admit of a doubt that any riparian privileges which he might have had would have parted from him to the purchaser. These privileges would be the wharfing right before referred to, and the right to accretions to the land formed in the water, naturally or artificially.
The question then arises whether a conveyance of the fee of the street to the United States operates similarly; whether it passes to the United States all the incidents of private ownership. . For if it does, it is obvious that these riparian rights cannot also remain in the grantor and his successors in the ownership of land separated from the river by the granted land.
It is forcibly argued for the complainant, that even the grant of the fee-simple of land laid out as a street should be deemed to. convey no more incidents than are necessary to the use of the street, of which the wharfing privilege is not one. If this be correct, there can be no substantial difference between the mere dedication of the street over the land of a private owner to the public, while the fee remains in him, and the actual conveyance of the fee of the street to the public. For, in each case, all the incidents necessary to the use of the street as such, and no more, would pass. Whether this be so, is= to be inquired into in the light of the authorities.
Now let us recur, in the first place, to the case of Van Ness vs. City of Washington and the United States.
By act of May 7, 1822, Congress authorized certain public reservations, and a small portion of B street north, as *291 theretofore laid out on the plan of the city of Washington, to belaid out into lots and sold by the corporation of Washington to private purchasers, aud appropriated the proceeds to certain objects. It authorized the heirs of former proprietors to file a bill against the United States to determine their claim to the land in question, and what proportion, if any, of the proceeds the parties might be entitled to.
Van Ness and wife, claiming under David Burns, an original proprietor, brought this suit, claiming that it wTas a part of the contract between the original proprietor and the United States, that the land selected for streets and public reservations should be forever kept open for public use, and that if this public use was abandoned, the title of the United States was determined, or, at least, that the original proprietor had a right to a fair and equal division of the lots laid out,or their proceeds.
Now, if the fee of this land had been vested in a private owner, subject to a public use as a street, we know that upon the termination of the public use the private owner of the fee would resume the absolute control and power of disposition over the land.
Was the rule different in respect to the ownership of this land of the United States? On the contrary, the court held the United States to be just as much the absolute owner of the land, with the same power of absolute appropriation, as an individual would be, who held the fee under similar circumstances. They held the title of the United States tobe the same when the public use was abandoned, as it would be if the United States had bought a single lot in fee simple for any government object. If, for instance, land had been bought for the purpose of erecting government storehouses on it, a case in which there would be no public user, as in the case of a street, the court evidently thought the title could not be more absolute than that acquired by the United States in the streets and reservations. The ownership was evidently deemed a complete, absolute, unqualified ownership in no wise different from that of private individuals.
*292 Now, whatever we might think of this question as one of first impression, we are compelled to treat this decision as authoritative, as well as to accept the logical consequences.
If, for instance, Water street was legallg abandoned, it might be divided into lots and sold by the United States to private persons. Could there be a question then that the riparian rights incident to the private ownership would be acquired by the purchasers of the fee simple? And-how could they pass unless they were an incident or appurtenance to the fee on the shore, owned by the United States. If the Supreme Court are right in asserting for the United States this unqualified ownership of the soil of the streets, it is difficult to avoid the inference that the usual accompaniments of riparian ownership attach to it, and that the right of wharfing on the river belongs to the United States.
The decisions of the State courts throw further light upon this subject.
The difference between the ownership of the soil of streets in a city, subject to the public easement, by private persons, and its ownership by the city itself, is illustrated by the decisions in reference to steam railroads in the streets of a city.
Where the fee of the streets remains in the adjacent private owner, it is generally, though not universally, held that the use of the street for a steam railroad would be an additional burden or easement on the proprietor of the fee, which could not be authorized by the city without a new assessment of damages. But if the fee in the streets or other highways be in the public or in the municipality, it seems settled, that the State or city may allow them to be used for a steam railroad without additional compensation. 2 Dill, on Mun. Corp., secs. 556, 557. In other words, the fee-simple title gives to the public the control over the streets which properly belong to that species of title, subject to the public easement.
There are other cases illustrating the general proposition *293 that the fee-simple title in the public carries with it the incidents that attach to such a.title in the hands of a private person.
In the case of Des Moines vs. Hall, 24 Iowa, 234, in which it appeared that the fee of certain streets was in the town of Des Moines in virtue of a provision in the code of the State of Iowa, which gave that effect to the laying off and recording of an addition to the town, it was held, that the original proprietor had no right to the subterraneous coal within the limits of the streets, and the corporation might sue him for coal taken by him therefrom.
The court say : “And we are inclined to believe that it was the object of the legislature, in withholding the title of the streets from the lot owner, divesting the proprietor thereof, and placing it in the public, to give to the corporate authorities the fullest power and control over the same which can arise from title, in order that all improvements of them as highways, might be made without let or hindrance from any quarter. At all events, it is always the better and safer course to interpret a statute according to the natural import of the language used.”
And again, upon a rehearing : “ At common law the dedication of land for streets was of the use simply. The statute changes this, makes the dedication extend to the soil, and the soil includes, of course, the minerals therein. It is an inaccurate and mistaken use of the term fee-simple, to limit it to a mere use. It is a correct and proper use of the word to express the idea of the right or title to the soil.
In the case of Cook vs. City of Burlington, 30 Iowa, 94, cited in the brief for complainants, it was held that where the fee simple of a street bordering a river was in the city, subject to the public use, the accretions formed beyond the street, as an incident to the street partook of the same character and were held by the same terms as the principal.
The decision was in favor of a citizen’s right to the same public use of the accretions as of the original street, but in *294 cidentally, it asserts for the ownership of a street by the city, one of the incidents of private ownership, viz., the right to accretions.
So, in the case of Mayor, &c., of Memphis vs. Wright, 6 Yerger, 497, in which it appeared that the city of Memphis had laid off part of the promenade in front of the town as landings, and this was a suit for a penalty imposed by an ordinance regulating their use.
The court said : “ The public property belongs to the corporators and may be appropriated by them to any use they may think proper. The mayor, &c., are the representatives of these corporator’s, and have vested in them all the right to dispose of and apply to any use they may think proper, the public promenade, public squares, which existed in the original proprietors,” &c. It must therefore be among the powers of a corporate town, having by its charter a right “to do all thing necessary to be done by corporations, * * * to construct wharves and other conveniences for the trade and comfort of its citizens, and by ordinances to regulate the manner in which they shall be used,” &c.
So, in the city of Boston vs. Lecraw, 17 How., 426, it was held, that where the ancient laws of Massachusetts provided that a littoral proprietor of land owned down to low water mark, subject to the condition that until he occupied the space between high and low "water mark, the public had a right to use it for navigation, the city of Boston had the same right as other littoral proprietors, and the title to a street terminating on the sea being in the town, the city had control over a dock formed at the foot of the street between -twTo private wharves, and might construct sewers therein, &c., &c.
The case of Doe vs. Jones, 11 Alabama, 63, was an ejectment by one claiming the fee of a street against one occupying a wharf at its terminus, erected under license from the corporation of Mobile. The court below charged the jury that if they should find the street to have been dedicated and established as a public street, under the government of *295 Spain, &c., and that it extended to the river Mobile, the fee of the street would be in the public, for the use of the city, and that all riparian rights in front of that street would belong to the city.
The court above sustained this as correct, and suggest, without however finding it necessary to decide it, that even if the fee of the street were in the plaintiffs, it would be competent for the city to establish a wharf at the terminus of the street or to lease that privilege to an individual. They further held that accretions became a part of the street.
In several of the cases referred to, the ownership of the soil next the shore is relied on as giving riparian rights to the public, State or city. There are others, however, which ignore any distinction between a dedication of the soil and a dedication of the mere use to the public, at least, in the case of a riparian street, and hold the effect of both to be the same, but in a sense adverse to the position of the complainants.
We have seen that in the Alabama case it was suggested, though not decided, that even if the fee of the street remained in the proprietor, it would be competent for the city to establish a wharf at the terminus of the street or to lease that privilege to an individual.
But in the case of the City of Newport vs. Taylor’s Executor, 6 B. Monroe, 699, the direct, question was decided as to a street or common bordering on the river Ohio, in the city of blew port. One Taylor had laid out a tract of land as a city, to be called Newport, on the plan of which a common or esplanade was laid out between certain lots and the river Ohio. An act of the legislature vested the land comprehended in the town in certain trustees, and provided, among other things, that this common “ shall forever remain for the use and benefit of the town.” The Supreme Court of the United States, as we may infer from the decision in the Yan Ness case, would have held that this language vested the fee in the town. But, for some reason, the Kentucky court, following a prior decision, held the fee to re *296 main in Taylor, the original proprietor. The contest was between the city of Newport and Taylor’s representatives as to the right of the latter to ferry across the river from the common in question, they claiming that the ferry right which existed antecedently, was reserved from the dedication.
The city claimed an account of the profits of the ferry. The defendants made a counter-claim to the profits derived from the wharves erected by the city on the land in question.
The court held that, subject to the ferny right, which, in their opinion, had been reserved, the dedication of the slip of ground in question was for all uses such as are implied in the dedication of a narrow slip of ground between the lots and a navigable river, which include the right of constructing wharves and charging wharfage. They consequently held the claim of defendants for an account of wharfage received by the city to have been properly dismissed. Here then, the right to build wharves is recognised as one of the incidents of ownership by a city of the mere use of a common or esplanade bordering on the river. The same idea is more fully developed by a decision prior to this, in the case of Rowan’s Executor vs. The Town of Portland, 8 B. Monroe, 232. One Lytle had laid out a town, under the name of Portland, on his land. On the plat Water street was represented as of the width of 100 feet, running up and down the river, through the whole extent of the town. Other streets ran parallel with and at-right angles to Water street. Lots were sold at public auction. This street was held to have been irrevocably dedicated by Lytle to the public. No question arose as to where the legal title was lodged, but the question was as to the effect óf this dedication in'a contest between the town and the alienees of Lytle upon a claim of the latter of the right of wharfage and charging tolls or duties for landing merchandise, &c., along the edge of this street, called a slip.
The court say: “ The practical question is whether the • right of wharfage or of charging tolls or duties for the landing and shipping of merchandise, and for the mooring of *297 boats along the edge of this slip, as claimed by the alienees of Lytle, was a right reserved from dedication, or, in other words, whether it is or is not inconsistent with those rights and uses for which the slip must be understood to have been dedicated. Upon this question, we have been referred to and have found but little direct authority, except so far as the cases already cited establish the right of a free and unobstructed access to the river, and of the undisturbed common use of its bank for the purposes of commerce, and therefore for the lading and unlading of goods. We understand, however, that this right of wharfage is, as its name imports, a riparian right, a right to charge for the use of the bank or shore of the river, and for such facilities as are furnished for such use, by the erection of wharves and other accommodations. The word key or quay is defined to be ‘ a wharf to land Or ship goods or wares at,’ and keyage is ‘ the money or toll taken for loading or unloading wares at a key or wharf.’ As the charge does not arise from the use or occupation of the water or river which is free and open to all for the purposes of navigation and commerce, but for the use of the shore, in which there is a property in some person, natural or artificial, it would be immaterial to inquire whether Lytle was the owner of the land covered by the river on the side next to the town, or whether, if he were, the dedication of the land to the water’s edge would not be carried ad medium filum aquce." * * * “It may be that the owner of the shore of a river may have a right to charge for the use of his land in lading or unlading goods or for fastening a boat to a tree or stake on the shore, though there were no wharf at the place.
“ The latter right, as far as it exists, is the result of that full dominion which every one has over his own land, by which he is authorized to keep all others from coming upon it except upon his own terms. Unquestionably such aright in Lytle would have been directly inconsistent with that use of the shore for communication with the river, which he certainly dedicated to the public.
“ The exercise of such a right would be a manifest disad *298 vantage to the town and a palpable violation of the public right necessarily implied in the dedication. Then neither Lytle nor his alienees had, as owners of the soil, and as against the town, a right to charge toll upon the commerce of the town or upon the access to and from the river. Had they the right, then, at their own will, and for their own profit, and independently of the permission of the town, to erect a wharf ? This right, if it existed at all, as an individual right, was exclusive and is claimed to be so.
“If Lytle, in virtue of his legal title and proprietorship, had the right at his own will, and for his own profit, to make wharves and regulate the tolls, then the town had no such right. . And conceding, as we do, that the making of a proper wharf, with reasonable tolls for its use, would not necessarily obstruct the public access to the river, and might be advantageous to the town as a place of commerce, it seems to us that this concession tends strongly to prove that this is one of the uses for which the slip was dedicated, and that it was not reserved as an individual right to the proprietor. To say that the proprietor has this right, to be exercised at his own will, is to make him master of the commerce of the town, with power to withhold from it the facilities which may be necessary for a successful competition with other towns and the full enjoyment of the advantages presented by its position,” &c., &c. The court directed the court below to decree the possession of the slip in question to the town.
The original advertisement of the lots had set forth the advantages of this town as a place of commerce, and some little stress had been laid on this in connection with the dedication ,• and when we consider the expectations entertained in regard to the future of Washington, the elaborate display of wharves on some of the plats, the discussion of the. water privileges before referred to, &c., there is hardly a word in the decision that has not a pertinent application to the city of Washington.
In opposition to these authorities, we have nothing but the case of Chesapeake & Ohio Canal Co. vs. Union Bank of *299 Georgetown, 5 Cranch, 509, in which two judges of the former Circuit court of the District, held a party owning lots on Twenty-eighth street, which separated them from Rock Creek, entitled to a wharf constructed by him into <the creek and consequently to the damages awarded for the condemnation of the water privilege in front of those lots, for use of the Chesapeake & Ohio Canal Company.
The argument and opinion are very brief, and the reasons of the latter are not clearly stated. It may be that, against the position taken by counsel, the court found that there was ground between the street and the creek owned by the party holding the wharf. The Van Ness decision is not alluded to, important as its bearing was on the questiou. It may have been that the wharf was constructed under a license or contract with the commissioners, and the destruction or use of this wharf only was the subject of condemnation, for the court put the decision’ apparently on the sole ground that Harbaugh was entitled to his wharf. The decision is too meagre to furnish us a satisfactory guide.
It seems to us, therefore, upon a review of the authorities, that the conveyance of the fee simple of Water street passed to the United States all the riparian rights connected with the ownership of that land, and that even the mere dedication of the street to public use, without a conveyance of the fee simple, might have had the same effect.
The wharfing privilege, one of these rights, as stated in one of the decisions referred to, is necessarily exclusive in its character. It is not like a right of way which is susceptible of enjoyment by all persons. It is a privilege of erecting a permanent structure on a given point and using it for a party’s private emolument, and this is no more possible to two parties having adverse interests, than for two bodies to occupy a given space at the same time.
ít is yet to be inquired whether the United States have parted with this exclusive privilege in any way, to any person or persons under whom the complainants claim.
Before the division between the commissioners and Notley Young, provided for by the deed of trust from him, took *300 place, the commissioners made a contract with Robert Morris and James Greenleaf for the sale to them of six thousand lots, out of those that had been or should be assigned to the United States, to include the part of the city in Notley Young’s land. They were not to have the privilege, however, of selecting water lots as part of this number ; but the agreement contained the proviso that said Robert Morris and James Greenleaf are entitled to the lots in Notley Young’s land and of course to the privilege of wharfing annexed thereto. As squares 472 and 504 are part of Notley Young’s land, this agreement is relied on as evidence that the wharfing privilege was annexed to them, among other squares similarly situated ; especially, as it is claimed that there were no squares or lots to which said wharfing privilege could be annexed except those in like situation, i. e., with Water street between them and the river.
Now, we do not understand the commissioners as undertaking to create a wharfing privilege where none existed before, but as simply agreeing to convey certain lots of ground, and as an incident thereto, the wharfing privilege attached to them by law. Nor do we understand the commissioners to assume to decide, authoritatively, that a wharfing privilege is attached to the lots in Notley Young’s land. They had no power so to decide, and very properly declined to do so, some years later, when applied to by Nicholas King in behalf of Robert Peter, to know the extent of whaiding privileges attached to water lots assigned the latter.
They say, in a letter of June 25, 1798: “ When the commissioners have proceeded to divide a square, with a city proprietor, whether water or other property, they have executed all the powers vested in them to act upon the subject. It appertains to the several courts of the State and the United States, to determine upon the rights such division may give ; any decision by us on the subject would be extrajudicial and nugatory.”
The use of this language in the agreement is probably easily explained. The agreement was made December 24, *301 1793. At that time, the work of surveying the squares and streets in Notley Young’s land was incomplete, and it was not known what squares, if any, could be bounded by the water, and whether Water street, separating them all from the water, would be finally adopted.' And this, in fact, seems not to have been determined until June 24, 1794, when the commissioners directed “ that the survey and returns made of the part of the city on Mr. Young’s laud, adjoining Potomack, leaving Water street according to the design of the plan of the city, be acted on, instead of the returns made by Major Ellicott, in some instances bounded with and in others near the water.”
According to the first returns, then, there were squares bounded by the water, and to these, doubtless, the wharfing privilege would be attached ; and in this condition of uncertainty, the commissioners could very properly use the language of the agreement with reference to a possible but yet unascertained privilege. It amounts to no more than a sale, with the lots, of such wharfing as may, by law, be attached.
The fact that the Ellicott plan was exhibited at the public sales of lots, showing a series of wharves, is somewhat i’elied on. The map does not indicate, nor is there any evidence that representations were made at those sales, that the wharves were to be an appurtenance to the ground facing them on the other side of the street, or that the wharfing privilege was to be considered such an appurtenance. The act of Maryland of December 19,1791, empowered the commissioners to license the building of wharves in the Potomac until Congress shall exercise jurisdiction and government within the District. The utmost that a map of the kind referred to could be said to hold out, is, that the privilege would be granted to erect wharves according to the plan exhibited, or that the United States themselves would erect them. The mere exhibition of such a map, at a sale of lots, could hold out no other prospect than that. But it does not seem that Morris and Greenleaf bought at such sales or with reference to such map. Their purchase, as far as appears, was a private one, and before it was consummated by a con *302 veyance, the Ellicott plan was rejected and a new one adopted essentially different. It certainly does not appear that Greenleaf or Morris ever claimed rights as acquired on the faith of the former having been definitely adopted.
Reliance is also placed upon a certificate issued by the commissioners to John Templeman, January 24, 1794, for certain lots in square No. 8, bounded on the west by Twenty-seventh street, on which is the endorsement: “ It is the intention of this certificate that the ground across the street next the water, with the privilege of wharfing beyond the street in front and of the breadth of the lots, pass with them, agreeably to the general idea in similar instances.”
Here, it will be observed, there was ground across the street and between it and the water ; ground probably insufficient to lay out into separate squares, but sufficient to have a water privilege attached, and the idea simply was, that, in such case, this ground, with its water privilege, should be conveyed with the lots on the inner side of the street. Accordingly, when the lots were paid for and the commissioners came to make their deed to Templeman, which is dated January 15, 1798, and recorded in Liber C, No. 3, fol. 287, they do not convey the wTater privilege as an appurtenance of the lots in square No. 8, but they conveyed these lots, being Nos. 1, 2, 3, 4, 5, 6, 7, 17 and 18, “ together with all the land in front and of the breadth of said lots, Nos., &c., from Twenty-seventh street in the said city to the river Potomac, with all the advantages of wharfing on the same ” (i. e., the land running from the street into the river), into the Potomac,” &c.
If this is the general idea referred to in their indorsement aforementioned, it is obvious that it lends no aid to the theory of complainants.
Some reliance is also placed upon the entries in a book found in the office of the commissioner of public buildings, called Division Book No. 1, in which square No. 472 is entered as having 214 feet 3 inches of water front, and square 504 as fronting 275 feet and 3 inches on Water street. The evidence shows that this book is of uncertain origin and *303 authority. The meaning of these entries is equally uncertain. The square may be said to have a water front when no private property—nothing but a street—intervenes between it and the water. The use of different language as to square 504, situated exactly as this, would indicate that nothing further was intended. We are unable to see in these entries any declaration of water rights as attachéd to these squares, and if they could bear that interpretation, we could only regard them as a speculative suggestion, with no further significance than that contained in the agreement with Morris and Greenleaf, before referred to, and equally barren of authority.
But further proceedings of the commissioners and others interested in the subject show that there was no rule as to water privileges, including the right to wharf, at any time, which could be considered as established and officially recognized.
We see the beginning only of the question involved in this suit, to wit, the effect of the intervention of a street between a lot and the river. In October, 1795, the commissioners say to James Barry : “We think, with you, that an imaginary continuation of Georgia avenue through a considerable depth of tide water, thereby cutting off' the water privilege of square 771 to wharf to the channel, too absurd to form a part of the plan of the city of Washington ; that it never was a part of the plan that such streets should be continued through the water, and that your purchase in square 771 gives a perfect right to wharf to any extent in front or south of the property purchased by you,” &c., &c. The significance of this is the indication it affords that both parties apprehended the effect of a real instead of an imaginary street, extended between a square and the water, to be the exclusion of a wharfing privilege from that square. The same idea seemed to be in the minds of the commissioners when they wrote to Nicholas King, as beforementioned, June 25, 1798. In the letter referred to, they say : “ With respect to square 22, we do not conceive that it is entitled to any water privilege, as a street intervenes between it and *304 the water ; but as there is some high ground between the Water street and the water, we have no objection to laying out a new square between Water street and the channel,” &c.
The intervention of this high ground was sufficient to exclude the water privilege, but it is none the less apparent that the intervention of the street was a circumstance affecting the judgment of the commissioners.
The unsettled nature of this subject is further shown by a communication from a number of proprietors to President Adams, dated November 10, 1798, in which they say : “ We know your excellency will attend to the necessity of defining what water privilege or right of wharfage is attached to the lots on the Eastern Branch, the Potomac river and Rock creek,” &c., &c.
There are no other proceedings or acts occurring during the regime of the commissioners, which seem to have any bearing on this subject. We have examined them thus far, to see whether the commissioners ever attempted to commit the United States to a surrender of its riparian rights acquired by the grant of the streets, and fail to find any evidence of that fact.
The office of commissioners was abolished in. 1801, and they were succeeded by a new officer, called a superintendent, and in 1816, he, in turn, was superseded by the commissioner of public buildings. After the office of commissioners ceased to exist, the question of wharfing privileges, as a theme of discussion, seems to have slept for many years. It was revived in 1834 and 1835, by discussions in the public journals, and the city councils.
A great deal of testimony has been taken, and argument expended on topics connected with this general subject, such as the topography of the property in question, the actual enjoyment of wharfing privileges and construction of wharves by private persons, the recognition of their proprietary interest by the United States and the city of Washington, the taxation of the same as' private property, the action of the corporation of Washington on the subject, the opinions of private citizens on the question, &c.
*305 But the conclusions which we have arrived at, dispense us from the necessity of commenting on those topics in detail.
There is no estoppel or bar of time against the United States, nor could their rights be affected by any action of the city of Washington, nor do private opinions, unanimous or divided, supply the court any assistance in defining them.
We are satisfied that the United States, in virtue of their ownership of the streets, have always had the exclusive right to construct or license wharves at the termination of streets running to the river and along Water street, which binds on the river, and that the United States have not parted with this right.
With this conviction, we are constrained to decree a dismissal of these bills, with costs.